JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Student Doe, minor suing under fictitious name for privacy reasons, by and through Student Doe's parents, Father Doe and Mother Doe, suing under fictitious names to protect the identity and privacy of Student Doe, their minor child and Father Doe and Mother Doe, individually and on their own behalf.

**(b)** County of Residence of First Listed Plaintiff  **Montgomery**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott H. Wolpert, Esquire, Timoney Knox, LLP
400 Maryland Drive, Fort Washington, PA 19034
215-540-2656

## DEFENDANTS
Abington Friends School

County of Residence of First Listed Defendant  **Montgomery**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 367 Health Care/ Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | **LABOR** | ☐ 840 Trademark ☐ 880 Defend Trade Secrets | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §2000d et seq.; 29 U.S.C. § 794
Brief description of cause: Contract, Tort and Civil Rights Claims for Race, Religion and Disability-based Harassment and Discrimination in School

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
N/A
JUDGE _____  DOCKET NUMBER _____

DATE  1/4/2022
SIGNATURE OF ATTORNEY OF RECORD  *Scott H. Wolpert*

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STUDENT DOE**, minor suing under fictitious name | : |
| for privacy reasons, by and through STUDENT DOE'S parents, | : |
| **FATHER DOE** and **MOTHER DOE**, | : |
| suing under fictitious names to protect the identity | : |
| and privacy of **STUDENT DOE**, their minor child, | : |
| | : CIVIL ACTION NO. |
| and | : |
| | : |
| **FATHER DOE** and **MOTHER DOE**, individually and on their | : |
| own behalf, | : |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| **ABINGTON FRIENDS SCHOOL**, | : |
| Defendant. | : |
| | : |

**VERIFIED COMPLAINT AND JURY DEMAND**

Plaintiffs, Father Doe and Mother Doe, individually and on behalf of their minor child, Student Doe, by and through their undersigned attorneys, hereby complain of Defendant, Abington Friends School ("AFS") as follows:

**I.     INTRODUCTION**

1.     Plaintiffs, Father Doe and Mother Doe, individually and on behalf of their minor child, Student Doe, sue for breach of contract, breach of implied covenant of good faith and fair dealing, intentional infliction of emotional distress, negligent infliction of emotional distress, discrimination in violation of Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d *et seq*., and discrimination in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, against AFS, a recipient of federal financial assistance.

2.     Student Doe is a white, Jewish child with a disability who attended AFS Middle School during Student Doe's 8th grade school year (2019-20) and AFS Upper School during

Student Doe's 9th grade school year (2020-21), during which time, Student Doe was subjected to racially-charged harassment and bullying, anti-Semitic comments, and an increasingly hostile environment both in school and virtually.

3.      Specifically, during Student Doe's 8th grade school year in the AFS Middle School (2019-20) and 9th grade school year in the AFS Upper School (2020-21), AFS students singled out Student Doe and denounced Student Doe as a "racist," and began openly harassing and bullying Student Doe at school, as well as through text messaging and on social media. During those two school years, Student Doe became the object of a character assassination campaign led by a specific group of black students in Student Doe's class at AFS (which included Student 1, Student 2, and Student 3), who openly harassed and bullied Student Doe and claimed that Student Doe was a "racist" because Student Doe hosted a bar/bat mitzvah party in which some young guests at the party (not Student Doe) allegedly said the "N-word" when singing along with the lyrics of a popular rap song; because Student Doe voiced opinions in class at AFS supporting Joe Biden and Mike Bloomberg during the Democratic primaries; because Student Doe typed the word "monkey" in response to a monkey-face emoji sent by Student 1, a black AFS student, during a Snapchat Group Chat that included both black and white AFS students; and because Student Doe wore bronzer on Student Doe's face which was maliciously characterized by AFS students as "blackfishing." This specific group of black AFS students in Student Doe's class also began to coerce other AFS students into falsely accusing Student Doe of being a "racist" and using the "N-word," and on one occasion spread around a photo of one of Student Doe's friends with an offensive caption on it that said "Look at this [N-word]" and telling others that Student Doe had created it and shared it on social media, which was not true. These AFS students also anonymously posted a meme on the AFS Confessions Instagram

1797882-2

account, which was followed by 132 members of the AFS community, that showed two separate pictures of Student Doe side-by-side to show the difference in Student Doe's skin's complexion when Student Doe used bronzer, and called Student Doe a "racist."

4.     These same AFS students, and particularly Student 1, also demonstrated hostility toward Jewish students at AFS, including Student Doe, and made numerous anti-Semitic remarks to Student Doe at school, including Student 1 telling Student Doe (and others at AFS) that "all Jews were racist" and that Student 1 had "never met a Jew who wasn't racist," in order to both harass and offend Student Doe and to continue to perpetuate the false narrative and accusations of Student Doe being a "racist." Another AFS student ("Student 5") sent Student Doe an image which depicted a photo of Adolf Hitler in full Nazi uniform with the statement, "I would make a Jew joke but I'm sure you've heard it 6 million times."

5.     Although Father Doe and Mother Doe immediately reported each of these incidents of bullying and harassment to the AFS administration, including to the Head of the Upper School, Dominique ("Dom") Gerard, and the Head of School, Richard Nourie, AFS improperly and intentionally failed to follow the policies and procedures found in the AFS Handbook to discipline the specific group of AFS students who were openly harassing and bullying Student Doe, or to take prompt action to investigate and to halt their campaign of harassment against Student Doe. By its actions and inactions, AFS essentially endorsed the false and malicious harassment and bullying of Student Doe.

6.     As a result, the harassment and bullying by AFS students toward Student Doe continued – aided and abetted by AFS and its administrators – with another AFS student, Student 4, sending Student Doe a message as late as May 5, 2021 calling Student Doe a "privileged white [expletive]." Student Doe remained shunned, was isolated and suffered, and continues to suffer,

severe physical, mental and emotional trauma. Student Doe was never reintegrated into the AFS community with Student Doe's class, never received an apology or an acknowledgment from any of the AFS students involved (with the exception of Student 3) of the pain they caused Student Doe, was never socially reacquainted with or accepted by Student Doe's peers at AFS, and did not feel emotionally able to return to campus for in-person learning for the remainder of the 2020-21 school year. After their pleas to AFS for help for their child were met with indifference, Father Doe and Mother Doe were left with no choice but to withdraw Student Doe from AFS at the end of the 2020-21 school year in order to remove Student Doe from the hostile school environment at AFS. Had AFS not elected to take the unusual step to institute "block scheduling," whereby each subject was taught in one semester rather than over the course of a two-semester year, Father Doe and Mother Doe would have withdrawn Student Doe earlier.

7.     Additionally, throughout Student Doe's 9th grade school year (2020-21), AFS failed to recognize its legal obligations as a recipient of federal funds, as well as pursuant to its own Handbook, to support Student Doe, who is a qualified individual with disabilities (including a Specific Learning Disability and Anxiety). These failures included, but are not limited to, AFS's (1) failure to evaluate Student Doe, (2) failure to convene a meeting to determine what accommodations Student Doe needed to access the school's programs, (3) failure to issue a written plan that provided for the accommodations Student Doe required as a result of Student Doe's disabilities, and (4) failure to provide accommodations and supplemental services to Student Doe constituting discrimination under Section 504.

## II.   PARTIES

8.     Plaintiffs, Father Doe and Mother Doe, are adult individuals who are the natural parents of Plaintiff, Student Doe. They sue for themselves individually and on behalf of their

minor child, Student Doe. They reside together within the County of Montgomery in the Commonwealth of Pennsylvania. They bring this action as Father Doe and Mother Doe rather than by their own names because naming them would reveal the identity of Plaintiff, Student Doe.

9.     Plaintiff, Student Doe, resides with Student Doe's parents, Father Doe and Mother Doe, within the County of Montgomery in the Commonwealth of Pennsylvania. Student Doe was a student at AFS from the beginning of Student Doe's 8th grade school year (2019-20) through the end of Student Doe's 9th grade school year (2020-21), for which Father Doe and Mother Doe paid tuition and related fees and costs. Student Doe sues herein under this fictitious name because Student Doe is a minor with disabilities, is vulnerable to possible serious harms from disclosure of Student Doe's identity, and the litigation involves matters that are highly sensitive and of a personal nature.

10.     Defendant, AFS, is an independent, non-public school incorporated under the laws of the Commonwealth of Pennsylvania with a campus and principal place of business located at 575 Washington Lane, Jenkintown, County of Montgomery, in the Commonwealth of Pennsylvania.

11.     At all relevant times, AFS acted by and through its employees, servants and agents, who at all times were acting within the course and scope of their employment, service and agency, for and on behalf of AFS.

12.     At all pertinent times herein, AFS was the recipient of federal funds, including a Paycheck Protection Program ("PPP") loan disbursed pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES ACT)" in 2020.

### III.    JURISDICTION AND VENUE

13.    Because this Complaint seeks relief under Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d *et seq*., and under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, this Court has subject matter jurisdiction over Counts V and VI pursuant to 28 U.S.C. § 1331, and over Counts I through IV pursuant to 28 U.S.C. § 1367 under the doctrine of pendent or supplemental jurisdiction.

14.    This Court has personal jurisdiction over AFS as it is located in and conducts business in this judicial district.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b)-(c), as AFS resides in this district and all of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### IV.    FACTS

#### A.  Student Doe Joins the AFS "Community" with the Class of 2024 and Development of a Formal Education Plan

16.    Prior to attending AFS for Student Doe's 8th and 9th grade school years, Student Doe attended a middle school in a the local public school district.

17.    Student Doe decided to apply to AFS for Student Doe's 8th grade school year because Student Doe desired a change from the large public school environment and wanted to experience the benefits of a private Quaker school, which held itself out as providing a socially responsible and academically rigorous education, a diverse student body, and a focus on fostering the ideals of community, spirituality, responsibility and stewardship. Student Doe was admitted to the AFS Middle School for the 2019-20 academic year.

18.    Student Doe's parents, Father Doe and Mother Doe, and AFS entered into binding enrollment contracts for the 2019-20 academic year, and later for the 2020-21 academic year. By

entering into these AFS enrollment contracts, which incorporate the terms of the AFS Handbooks and other written policies, and by paying the required tuition, which was $34,425.00 for the 2019-20 school year and $35,799.54 for the 2020-21 school year, Student Doe, Father Doe and Mother Doe, became entitled to all the rights conferred by the promises in the enrollment contracts, the AFS Handbooks and other written policies, and AFS was contractually bound to keep those promises to the Plaintiffs.

19.     Prior to enrolling at AFS, Student Doe had previously received special education services and supports from the local public school district as a student with a Specific Learning Disability in math as well as a well-documented diagnosis of Anxiety — both of which were known to AFS prior to the commencement of Student Doe's 8th grade school year at AFS.

20.     In early August 2019, prior to Student Doe's starting 8th grade at AFS, Father Doe and Mother Doe emailed the AFS Counselor, Kevin Ryan, informing him of Student Doe's anxiety issues and requesting a meeting before the school year started to ensure Student Doe had resources set up at school while Student Doe was making the adjustment to AFS.

21.     The first Student Support Team (SST) meeting was held on August 29, 2019. Prior to that meeting, Father Doe and Mother Doe provided AFS with a copy of a Psychological Evaluation Report prepared by Emily Perlis, PsyD in August/September 2016, which concluded that Student Doe had a Specific Learning Disability in the areas of math calculation and fluency. Father Doe and Mother Doe also provided AFS with a copy of the most recent IEP from the local public school district that addressed Student Doe's academic and anxiety-related needs.

22.     Following the August 29, 2019 SST meeting, Megan Asplundh, the Director of Wilf Learning Center at AFS, emailed Father Doe and Mother Doe a copy of the Formal Education Plan ("FEP") that was developed for Student Doe for Student Doe's 8th grade school

year. The FEP identified Student Doe's needs as math problem-solving, math calculations, math fact fluency, spatial reasoning, fluid reasoning, processing speed and anxiety, and provided for Student Doe to receive "adjustments" and "accommodations" to the academic program at AFS, which included check-ins with the learning specialist, grouping like problems in math, use of flashcards for math, small group instruction and re-teaching when possible, extended time in math and science during testing, repetition and/or clarification of instructions during testing, extra breaks during testing, use of a calculator during testing and in-class, and preferential seating. The FEP, however, did not provide Student Doe with any supports to help manage Student Doe's anxiety and merely noted that Student Doe was working with a therapist for anxiety out of school.

**B. Student Doe's 8th Grade School Year At AFS Middle School (2019-20)**

23.    When Student Doe started school at AFS in September 2019, Student Doe immediately struggled in keeping up with the classes and had significant social and school anxiety issues, including frequent panic attacks at school.

24.    AFS held a series of SST meetings with Father Doe and Mother Doe and, at times, with Student Doe's private therapist, Dr. Tamar Chansky, in which Student Doe's anxieties and emotional fragility was the center of discussion and attempts were made to support Student Doe in managing Student Doe's anxiety.

25.    AFS provided Student Doe extended time to complete assignments, quizzes and tests, and allowed Student Doe to take breaks, to leave class, and to delay taking or finishing quizzes/tests when Student Doe was experiencing anxiety or panic attacks.

26.    By mid-November 2019, Student Doe was overwhelmed in, and failing, Student Doe's classes due to late, missed and incomplete assignments, poor performance on quizzes and

tests, and a significant amount of missed class time as a result of Student Doe's anxiety and panic attacks.

27.     At that time, Student Doe's parents began reaching out regularly to Student Doe's teachers reminding them of Student Doe's anxiety issues and requesting updates on Student Doe's performance and additional support. Student Doe was provided with additional push-in and pull-out support in Student Doe's math class and the curriculum was modified for Student Doe. AFS utilized a "no grading" policy for Student Doe in most of Student Doe's classes and Student Doe's advisor began providing Father Doe and Mother Doe with bi-weekly check-ins to report on how Student Doe was doing in Student Doe's classes.

28.     Father Doe and Mother Doe hired a private tutor (Caroline Shuman), at their cost, to work with Student Doe 2-3 days per week, as recommended by AFS.

29.     Student Doe, however, continued to experience social and school anxieties and needed extensive support and accommodations in each of Student Doe's classes.

30.     The administrators and teachers at AFS clearly had knowledge of Student Doe's disabilities and related needs during Student Doe's 8th grade school year.

31.     Despite Student Doe's social anxieties, Student Doe did make friends at school during the 8th grade school year and Student Doe invited the entire 8th grade class to Student Doe's bar/bat mitzvah, which occurred during the first semester of Student Doe's 8th grade school year, and many of Student Doe's AFS classmates attended the event.

32.     Unfortunately, an incident allegedly occurred at the event, unbeknownst to Student Doe and Student Doe's family at the time, in which the DJ selected and played a rap song that, in its original version, repeatedly used the "N-word" in the lyrics. Although the DJ, who was black, had played a clean version of the song that bleeped out the "N-word" and other

offensive words in the lyrics, at least one of the young white guests at the party (not Student Doe) reportedly sang the real lyrics aloud using the "N-word."

33.     While Student Doe did not hear anyone sing the "N-word," nor did Father Doe or Mother Doe, another guest at the party, Student 1 – a black AFS student in Student Doe's 8th grade class – apparently reported later that he had felt uncomfortable with what had occurred, although he did not mention those feelings to Student Doe, Father Doe, Mother Doe or anyone else at the time and, in fact, expressed to Student Doe on video that he had a great time that night.

34.     Student Doe and Student Doe's family were completely unaware that Student 1 was uncomfortable or upset and were not informed of what had occurred until months later.

35.     A couple of months after the bar/bat mitzvah, Student 1 and a group of black AFS Middle School students, singled out Student Doe, denounced Student Doe as a "racist" and began openly harassing and bullying Student Doe at school, through text messaging, and on social media.

36.     During that time, Student Doe was subjected to a race-based harassment and bullying, anti-Semitic comments, and an increasingly hostile environment both in school and virtually. Student Doe become the object of a character assassination campaign led by this group of AFS students (which included Student 1, Student 2, and Student 3), that repeatedly referred to Student Doe as a "racist" for both what had occurred at the bar/bat mitzvah, and, later in the fall/winter 2019, because Student Doe had voiced opinions in class and openly expressed support for Joe Biden and Mike Bloomberg during the Democratic primaries.

37.     During that time, these AFS students, and particularly Student 1, also openly demonstrated hostility toward Jewish students, including Student Doe, and made numerous anti-

Semitic remarks to Student Doe that school year, including Student 1 telling Student Doe (and others at AFS) that "all Jews were racist" and that he had "never met a Jew who wasn't racist," in order to both harass and offend Student Doe and to continue to perpetuate the false narrative and accusations of Student Doe being a "racist."

38.     At least one of the AFS Middle School teachers, Sunshine O'Donnell, who was one of Student Doe's teachers, was made aware of the alleged incident at the bar/bat mitzvah and of what was occurring during the 2019-20 school year with respect to Student Doe, but she did nothing to proactively protect Student Doe from the harassment Student Doe was repeatedly subjected to by some of Student Doe's black peers at AFS.

39.     In the spring of 2020, Student Doe, Student 1 and a number of other AFS Middle School students were included in a Snapchat Group Chat. At one point during the group chat, Student 1 sent a message to the group that contained an emoji of a monkey's face, and Student Doe responded by typing the word "monkey," after which, Student 1 and other AFS students, including Student 2 and Student 3, immediately responded to Student Doe's message by acting as if Student Doe had actually called Student 1 a monkey. They directly called and referred to Student Doe in the group chat as a "racist," again perpetuating the narrative and accusations that falsely and maliciously attempted to characterize Student Doe as a "racist," and sent a barrage of insults and harassing group chat messages which were intended to torment and bully Student Doe.

40.     Not realizing what they were referring to, Student Doe initially responded by asking what Student Doe had done and then publically apologized in the group chat if anyone had interpreted Student Doe's comment the wrong way. Some of the other AFS students in the

group chat tried to defend Student Doe and stop the torment but Student 1, Student 2, Student 3 and other AFS students persisted in the bullying and harassment of Student Doe.

41.    Student Doe was emotionally distraught and reached out directly to Student 1 via private chat in order to offer him and his family some of Mother Doe's challah as a peace offering, but Student 1 refused to accept it, and the race-based and anti-Semitic bullying and harassment of Student Doe only continued. For instance, on May 22, 2020, an AFS student, Student 5, sent Student Doe an image which depicted a photo of Adolf Hitler in full Nazi uniform with the statement, "I would make a Jew joke but I'm sure you've heard it 6 million times."

42.    On May 28, 2020, Father Doe emailed Student Doe's 8th grade academic advisor, Justin Solonynka, requesting that Student 1, Student 2, and Student 3 not be in Student Doe's group during their 9th grade school year (2020-21).

43.    Justin Solonynka immediately responded via email stating "Hi [Father Doe] – We're ahead of you on this one. :) We are aware of those dynamics, but I will make doubly sure that the people making the advisories for next year keep it in mind." Justin Solonynka's email demonstrated that AFS administrators and staff had been directly aware of the ongoing harassment and bullying that Student Doe was subjected to by Student Doe's peers at AFS during the spring 2020, but AFS had ignored it and had done nothing to try to stop or prevent it.

44.    Father Doe responded via email that Student Doe, Father Doe and Mother Doe needed some reassurances from AFS that the issues between Student Doe and these students would be addressed by AFS prior to the start of the 2020-21 school year, and Justin Solonynka responded via email advising Father Doe to reach out to Dom Gerard, the Head of the Upper School.

45.     During the summer 2020, prior to the start of Student Doe's 9th grade school year (2020-21), Father Doe and Mother Doe emailed Dom Gerard, the Head of the Upper School, requesting a meeting to discuss the group of students in which Student Doe would be placed for the 9th grade school year. They participated in a virtual meeting on July 29, 2020. During that meeting, Dom Gerard, Father Doe and Mother Doe specifically discussed the ongoing harassment and bullying that Student Doe had been subjected to by Student 1, Student 2, and Student 3 and Dom Gerard was given the opportunity to address it.

46.     Unfortunately, AFS did not take prompt steps to investigate the reports of harassment and bullying by these AFS students, nor did AFS confront or discipline the three AFS students about their improper behaviors, nor did AFS try to prevent the harassment and bullying of Student Doe from continuing.

47.     Rather, instead of properly and timely addressing the situation, including but not limited to following the procedures stated in the AFS School Handbook, Dom Gerard merely devised a way to attempt to separate the students and to keep Student Doe from interacting with them in-person.

48.     To that end, AFS divided the entire 9th grade class into two groups – Group A (which were supposed to attend in-person classes on Mondays and Tuesdays) and Group B (which was supposed to attend in-person classes on Thursdays and Fridays). Student Doe was placed in Group B with Student 2 (as Student 2 was going to start off the year virtually anyway), but Student Doe still had to virtually attend classes and interact with the three boys (i.e., Health and English with Student 2, and Algebra 1 with all three boys).

49.     While Father Doe and Mother Doe were hopeful that the situation would resolve, Father Doe specifically cautioned Dom Gerard at the time that AFS's total avoidance of what

had occurred would not help bring about resolution of the situation and that some intervention from AFS would be necessary.

**C. Student Doe's 9th Grade School Year At AFS Upper School (2020-21)**

50.     In the beginning of Student Doe's 9th grade school year (2020-21), which began virtually but then transitioned to a hybrid model at the end of September 2020, Student Doe was excited to transition from virtual programming and return to campus.

51.     While Student Doe continued to struggle academically and with anxiety-related issues, Student Doe worked hard with the private tutor paid for separately by Father Doe and Mother Doe to try to keep up with Student Doe's classes.

52.     AFS, however, provided Student Doe with minimal, if any, supports during Student Doe's 2020-21 school year to help accommodate Student Doe's disabilities.

53.     By late-October 2020, Father Doe and Mother Doe noticed that Student Doe was continuing to struggle and reached out directly to the learning specialist and Director of the Wilf Learning Center at AFS, Megan Asplundh, requesting that she provide Student Doe additional support moving forward. They shared their concerns that Student Doe did not understand how to prepare for tests and that Student Doe had a private tutor, but needed more hands-on study skills. Mother Doe also requested a meeting with Megan Asplundh to discuss Student Doe's learning style and to determine how to help Student Doe.

54.     In a response email, Megan Asplundh said that her calendar was very full and then referenced information from Student Doe's evaluation that was conducted 4 years prior when Student Doe was a student at Wissahickon Middle School. She then merely encouraged Student Doe to complete some videos and resources that she had posted on Canvas and to follow up with the family's private tutor.

55.     In response, Father Doe and Mother Doe pointed out that the information from 2016 was no longer relevant and requested that she meet with Student Doe directly, but this never occurred.

56.     These failures to provide disability-related accommodations to Student Doe continued throughout the 2020-21 school year, despite AFS's knowledge of the ongoing harm being suffered by Student Doe, including the increase in Student Doe's anxiety.

57.     AFS clearly failed to recognize its legal obligations, as a recipient of federal funds, to support Student Doe, a student with a disability, and these failures included (1) failure to evaluate Student Doe, (2) failure to convene a meeting to determine what accommodations Student Doe needed to access the school's programs, (3) failure to issue a written plan that provided for the accommodations Student Doe required as a result of Student Doe's disabilities; and (4) failure to provide accommodations and supplemental services to Student Doe constituting discrimination under Section 504.

58.     Additionally, while the peer harassment and bullying situation was initially manageable due to AFS Upper School's hybrid schedule at the beginning of Student Doe's 9th grade school year, the peer harassment, bullying and disparagement of Student Doe by the same group of black students at AFS, and the false accusations of Student Doe being a "racist" continued at school, through texting and on social media.

59.     On or around December 6, 2020, Father Doe and Mother Doe contacted Dom Gerard and reported that the ongoing race-based harassment by AFS students, including Student 1, Student 2, Student 3, and Student 6 (who is white), continued, that it had created a hostile environment for Student Doe, and that Student Doe was being targeted once again by these students and falsely accused of being a "racist" and of "blackfishing" because Student Doe used

bronzer that made Student Doe's skin's complexion look darker. Father Doe and Mother Doe requested a meeting with Dom Gerard and with AFS's Counselor, Kevin Ryan, to discuss what could be done to resolve the ongoing race-based disparagement, harassment and bullying by these students.

60.     In response, on December 7, 2020, Dom Gerard acknowledged the "social challenges" that Student Doe was facing and requested that they provide him with copies of all of the texts and messages. Father Doe and Mother Doe promptly hand-delivered approximately 90 pages of harassing texts and messages for Dom Gerard to review.

61.     They met on December 8, 2020 to discuss what was occurring and, at that meeting, Dom Gerard and Matt Eskin, the Head of the AFS Middle School, promised Father Doe and Mother Doe that they would conduct an investigation and report back to them. While waiting for AFS's "investigation" to be conducted and completed, the race-based bullying and harassment of Student Doe by Student Doe's peers at AFS escalated.

62.     On the evening of December 10, 2020, a post was made by someone on the AFS Confessions Instagram account, which was followed by 132 members of the AFS community. It was a meme created using two separate pictures of Student Doe to show the difference in Student Doe's skin's complexion when Student Doe used bronzer, and calling Student Doe a "racist." It was done anonymously. When Student Doe saw the post, Student Doe became very upset, felt humiliated, and became hysterical.

63.     The next morning, on December 11, 2020, Father Doe and Mother Doe notified Dom Gerard and Kevin Ryan of the escalation of the bullying and of the devastating effect it had on Student Doe, and requested another call with them to discuss the latest incident and the immediate actions AFS would take to end the harassment of Student Doe by these AFS students.

Father Doe and Mother Doe also notified Student Doe's 9th grade academic advisors, Rosanne Mistretta and Kaitlyn Fitzpatrick, about what had occurred.

64.     Dom Gerard did not call Father Doe or Mother Doe but instead, in an email, said he was sorry for Student Doe and promised them he would address the situation that day. He did not, however, report back as to what had been done to address the situation.

65.     On the evening on December 15, 2020, Student Doe had learned that Student 1 was spreading around a photo of one of Student Doe's friends with an offensive caption on it that said "Look at this [N-word]". Student Doe was told that Student 1 was not only sharing the photo with the caption, but that he was telling everyone that Student Doe had created it and shared it on social media, which was not true.

66.     When Student Doe found out about the photo and what Student 1 was saying about Student Doe to other AFS students in an intentional attempt to publically harm Student Doe, Student Doe once again became hysterical. As Student Doe had several black friends at AFS, Student Doe was upset and worried that they would see the photo and believe these false statements.

67.     Father Doe emailed Dom Gerard that evening, notifying him of the latest incident, that the situation was "going from bad to worse," and requesting a phone call.

68.     Dom Gerard responded by email the next morning by requesting that Student Doe not reach out to Student 1 or to any of the other students involved and said that he would be available to talk that afternoon. At that point, Student Doe had not responded to any of the recent vicious allegations. Father Doe also emailed Dom Gerard providing him with additional information about the prior race-based and anti-Semitic comments that AFS students, particularly Student 1, had made to Student Doe in the past.

69.     Father Doe and Mother Doe also alerted Student Doe's 9th grade advisors as to what had occurred, as well as their belief that the offensive photo was created by another student at AFS who knew Student Doe's friend.

70.     Father Doe, Mother Doe, Dom Gerard and Matthew Eskin met virtually on the afternoon of December 16, 2020. During the meeting, Dom Gerard and Matthew Eskin told Father Doe and Mother Doe that they wanted to bring Student Doe and Student 1 together for a face-to-face meeting. Father Doe and Mother Doe agreed to such meeting in the hopes of bringing some resolution to the situation so that the ongoing harassment and bullying would stop – which they stated they hoped would occur prior to the winter break. Dom Gerard and Matthew Eskin asked Father Doe and Mother Doe to be patient and they agreed to do so.

71.     Unfortunately, Dom Gerard and Matthew Eskin not only did not immediately convene the proposed meeting between Student Doe and Student 1 before the winter break, but they ultimately never ended up facilitating the meeting they had promised.

72.     In the meantime, the situation at AFS only became worse for Student Doe. For instance, two of Student Doe's black friends at AFS heard the rumor that was being spread about Student Doe and accused Student Doe of using the "N-word" during a breakout session in one of their English classes. While Student Doe told them it was not true and that Student Doe had not created the picture, they did not believe Student Doe. These two back AFS students immediately ceased all social interaction with Student Doe.

73.     Immediately after this occurred, Father Doe emailed Matthew Eskin noting that "this is getting worse Matt and we do not know what to do." Mother Doe also emailed Dom Gerard and Matthew Eskin asserting that "the only way for this to stop is for AFS administration to make a statement to all students that this ends here." Mother Doe further advised them that

Student Doe was quickly slipping into a very dark place, and pleaded with them to take a stand and to take definitive and immediate action to end the harassment.

74.     While Father Doe and Mother Doe participated in another virtual meeting with Dom Gerard and Matthew Eskin on December 17, 2020, no definitive action was taken to resolve the situation for Student Doe. Moreover, AFS continued to fail to follow the required procedures in its own Upper School Handbook.

75.     At the end of winter break, Father Doe notified Dom Gerard, as well as Student Doe's advisors and teachers that Student Doe would not be returning to AFS in-person and would remain virtual until the situation with the other students was resolved.

76.     While waiting for AFS to take action to institute disciplinary procedures and to schedule and facilitate an in-person meeting of the students involved, Student Doe was socially isolated, Student Doe's "friends" would no longer speak to Student Doe, and Student Doe had zero communication with any of Student Doe's classmates. The whole experience was traumatizing for Student Doe.

77.     While Student Doe communicated with the 9th grade academic advisor several times via text and email, this was not sufficient to help Student Doe under the circumstances.

78.     Father Doe and Mother Doe followed up with various AFS administrators numerous times during the month of January 2021 in order to find out how the alleged "investigation" was going and what actions AFS would take to resolve the issues for Student Doe so Student Doe could be reintegrated into AFS and be able to return to campus.

79.     While Dom Gerard generally spoke to the entire student body on the first Wednesday back from winter break about social media and how to treat each other, he did not

address the incidents related to Student Doe or the individual AFS students that had been harassing and bullying Student Doe.

80.     Weeks went by without anyone at AFS providing Student Doe, Father Doe or Mother Doe with an update on AFS's plan to address the race-based and anti-Semitic harassment and bullying that Student Doe endured at AFS. By that time, Student Doe had been defriended by everyone in Student Doe's class from all social media platforms and had had no communication with anyone in Student Doe's class.

81.     In addition to the students who believed the lies and rumors about Student Doe and refused to talk to Student Doe, there were also other Jewish students (as well as non-Jewish students, black and white) who felt as if they had to back away from Student Doe because of the viciousness with which Student Doe had been attacked by other AFS students/peers. These students feared that any contact with Student Doe would put them in the line of fire and make them the next victims of Student 1, Student 2, Student 3, and Student 6, and they knew AFS would not do anything to combat the abuse and torment that these students inflicted on others at AFS.

82.     In response to AFS's inaction under the circumstances, on January 22, 2021, Father Doe called and left a message for Dom Gerard, and emailed him as well, noting that it had been two weeks since there had been any communication from Dom Gerard or anyone at AFS about the situation.

83.     Two days later, on January 24, 2021, Dom Gerard finally responded to Father Doe and Mother Doe, indicating that they had spoken with Student 1's parents and they told him that Student 1 had been "steering clear" of Student Doe, but nothing else was shared as far as whether Student 1 was disciplined or whether he received any consequences whatsoever for his

behaviors and violations of AFS community standards. Dom Gerard merely noted that he and Student 1's parents felt sorry for Student Doe's pain, but then showed his true lack of empathy for Student Doe and said that he could not control who friended or unfriended someone on social media.

84.     Dom Gerard clearly had not come up with any plan to address the issue head-on or to reintegrate Student Doe back into the AFS community with the rest of Student Doe's class, and incredibly, he never shared the results of the "investigation" and continued to ignore AFS's own required procedures as stated in the Upper School Handbook for violations of community standards and for bullying and harassment.

85.     Specifically, Section VII of the AFS 2020-21 Upper School Handbook ("Upper School Handbook"), titled "Community Standards," provided that, by attending AFS, students and their families agreed to abide by the community standards set forth in the Handbook. It enumerated minor violations and major violations of community standards and the consequences for those violations.

86.     In the Upper School Handbook, bullying and harassment in person or on social media was/is considered to be a "major violation" of the AFS community standards.

87.     The Upper School Handbook specifically stated that when a student violated a major community standard, the Dean of Students would convene the student-faculty Discipline Advisory Council ("DAC"), which was comprised of six students, four members of the faculty, and the Dean of Students. At the DAC meeting, the student would have to present his/her account of the events to the DAC. It provided that DAC members would then take into consideration all of the circumstances of a particular situation, including the student's answers to

questions during the procedures, and would reach a decision by consensus to recommend appropriate consequences to the Upper School Director or Head of School.

88.     The Upper School Handbook specifically provided that the goal of DAC was to help students who had violated community expectations to understand how their actions negatively impacted the community, to support them in finding ways to avoid such behavior in the future, and to assist them in rebuilding trust within the community.

89.     The Upper School Handbook further provided that, in more serious cases, DAC may recommend out-of-school suspension, dismissal or expulsion as a consequence, but that, more often, after-school detentions, loss of free periods, or day-long detentions could be recommended.

90.     The Upper School Handbook further provided that a typical DAC consequence included an apology to the appropriate party, a written reflection, and some type of additional action that would assist the learning process and help the student rebuild the trust of the community, and that most students who appeared before DAC were placed on behavioral probation for a specified amount of time, which meant that any further violation of a major community standard could result in dismissal from school. On February 5, 2021, Mother Doe met virtually with Rich Nourie, Head of School. When she requested that Mr. Nourie have the AFS students apologize to Student Doe, Mr. Nourie replied, "How will an apology make it better?"

91.     When AFS failed to follow those written rules and procedures and not to provide any consequences to the AFS students who committed major violations of the community standards, including Student 1, Student 2, and Student 3, AFS violated the Upper School Handbook and breached its contract with the Family.

92.     The Upper School Handbook also contained a Bullying and Harassment policy that provided that AFS was/is committed to creating a safe and supportive environment for all adults and students, and noted that bullying and harassment were not acceptable behavior for any AFS community member.

93.     The Upper School Handbook defined bullying as a severe, persistent, or pervasive and intentional act or series of intentional acts directed at another student that interfered with a student's education, created a threatening environment, or substantially disrupted the operation of the school. It provided that the bullying could be in written, verbal, physical, relational, or electronic form, could occur in many types of school-related environments, including in the classroom and online, and still fell under the jurisdiction of AFS if the act of bullying occurred outside of a school-related environment but involved AFS students.

94.     The Upper School Handbook also provided examples of bullying, including but not limited to: writing or saying insulting comments or threats; spreading rumors or gossiping; and psychological manipulation or provocation – all of which were clearly applicable to what Student Doe had endured at AFS.

95.     The Upper School Handbook further defined harassment as any behavior, intentional or not, that stigmatized, intimidated, or victimized someone for any reason, including but not limited to race, sex, religion, ethnicity, physical or other personal characteristics. The Upper School Handbook provided that harassment could be in written, verbal, physical, emotional, or electronic form and could occur across school-related environments, outside of school, and in the virtual realm.

96.     The Upper Handbook also provided examples of harassment including, but are not limited to: teasing someone because of their religion or other personal characteristics; saying

or writing insulting messages about someone because of their personal characteristics; and excluding someone because of their personal characteristics – all of which were also applicable to what Student Doe had endured at AFS.

97.     The Upper School Handbook further provided that, after a student had reported a concern or complaint about bullying or harassment to AFS, the AFS administration would initiate a prompt investigation and take appropriate action based on the circumstances, and, if bullying or harassment were confirmed, actions could include education, counseling, suspension, dismissal, or the involvement of law enforcement.

98.     When AFS failed to follow its own Bullying and Harassment policies, failed to properly and promptly investigate this matter, failed to immediately acknowledge and publicly label the individual AFS students' actions toward Student Doe, as described above, as bullying and harassment, and failed to promptly take appropriate actions based on the circumstances, it violated the Upper School Handbook and breached its contract with the Student Doe and Student Doe's family.

99.     Additionally, AFS issued and/or published on AFS's website an SBA Non-Discrimination Compliance Policy, which clearly and unambiguously acknowledged its obligations to comply with the regulations issued by the SBA and other governmental agencies in enforcing the civil rights laws. In the SBA Non-Discrimination Compliance Policy, AFS unequivocally acknowledged its obligations to prohibit discrimination, harassment, or retaliation on the basis of race, color, national origin, age, sex, disability/handicap, or religion in its educational programs, activities, and services.

100.    Another meeting was held between Father Doe, Mother Doe and Dom Gerard on January 25, 2021. Although Father Doe and Mother Doe had previously agreed that they would

meet with Student 1's parents and also agreed that Student Doe would meet with Student 1, it became clear that Dom Gerard had not advanced the situation by arranging either of those meetings. On the contrary, Dom Gerard confirmed that Student 1 and his parents did not believe that Student 1 had done anything wrong and they did not see any reason to sit down with or to apologize to Student Doe.

101.    Instead of addressing the harassment and bullying behavior that tormented Student Doe for months, in accordance with the Upper School Handbook, Dom Gerard callously defended the actions of Student 1 and said that Student 1 was just trying to have a "discussion about race" and, because Student Doe did not try to defend Student Doe's actions, Student 1 had been left with the impression that Student Doe was a "racist."

102.    Dom Gerard showed an inexcusable lack of empathy for what Student Doe had experienced and actually blamed Student Doe – the victim of the ongoing brutal harassment and social isolation – for not better defending against Student 1's and other AFS students' repeated attacks about Student Doe – when Dom Gerard himself had said on December 15, 2020 that Student Doe should not communicate with Student 1.

103.    Dom Gerard then actually went on to say, without having any conversation with Student Doe in over a month, that it was his opinion that Student Doe was not "psychologically ready" to sit down with Student 1 and that Student Doe should just talk to Student Doe's advisors instead.

104.    It was clear that Dom Gerard and the AFS administration were not going to properly investigate this situation or provide Student 1 or any of the other students who joined in this abhorrent behavior with any consequences for what they had done to Student Doe, an already fragile teenager with well-documented anxiety, who was becoming completely socially

isolated from all peers at AFS and who could not even return to AFS in-person because of the ongoing pattern of harassment, race-based and anti-Semitic bullying, as well as the false rumors and accusations made about Student Doe by these students.

105.    AFS did not discipline or punish these students in any way and they were merely told by AFS to stay away from Student Doe – which in no way resolved the problem and which in fact, perpetuated the ongoing harm to Student Doe.

106.    As of the date of that meeting, January 25, 2021, Dom Gerard demonstrated that, after 6 weeks' time, he still did not have a viable plan to truly address the racially-charged and hate-filled culture that existed at AFS and to reintegrate Student Doe back into the AFS community. Dom Gerard and the AFS administration continued to improperly and intentionally disregard the policies and procedures found in the Upper School Handbook which were required to address major violations of community standards.

107.    Following this meeting, Father Doe and Mother Doe recognized that there still was not a plan in place to support their child, so they provided Dom Gerard and the AFS administration with a plan moving forward which included facilitating a meeting between Student Doe and the students involved in order to hash out what had happened and to provide an apology; convening the DAC to determine how to discipline the individual students for their major violations of community standards in accordance with the Upper School Handbook; arranging for a presentation to the student body from outside speakers on anti-Semitism; and making a public statement to the student body making it known that Student Doe had been falsely accused and subjected to bullying, harassment and anti-Semitism, and that such behavior would not be tolerated any further at AFS.

108.    Prompted by Father Doe's and Mother Doe's persistence and determination to support their child, Dom Gerard convened a meeting with other AFS administrators on January 28, 2021, to finally develop a plan in addressing what had occurred.

109.    On January 29, 2021, Dom Gerard emailed Father Doe and Mother Doe acknowledging that "things had not improved as they had hoped" and advised them of the plan moving forward, which included: (1) having Student Doe's 9th grade academic advisors, in collaboration with Student Doe's therapist, work with Student Doe to connect Student Doe with some peers at AFS to end Student Doe's isolation; (2) developing "thoughtful programming" to improve group dynamics for the 9th grade class as a whole and in their advisories, and also talking to the 9th grade class as a whole on what had occurred specific to Student Doe; and (3) collaborating with AFS's Jewish students and families to make them feel more included in the diversity and inclusion work of the school, including incorporating training about anti-Semitism and reassessing AFS's English and History curricula to ensure all students were well-educated in the Holocaust and Jewish literature and histories.

110.    While this plan was a positive improvement over the complete lack of any semblance of a plan by AFS through that time, it was made clear that Dom Gerard and the AFS administration had solidified their decision to disregard the policies and procedures found in the Upper School Handbook meant to address major violations of community standards. AFS were not going to hold the individual students accountable for the ongoing harassment and bullying of Student Doe and were not going to bring the individual students together to try to achieve some immediate resolution.

111.    The failure of AFS to follow its own Upper School Handbook policies and procedures in response to ongoing complaints of race-based, and religious-based harassment of

Student Doe by other AFS students effectively constituted the disparate treatment of Student Doe by AFS based on Student Doe's race, national origin, and religion.

112.    On February 3, 2021, AFS held a Worship Sharing with the 9th grade class to begin a conversation about the 9th grade class' dynamics generally and on February 10, 2021, Dom Gerard spoke to the entire 9th grade class about what had occurred with Student Doe and the damage the situation caused Student Doe. This was the first time that Student Doe's harassment had been acknowledged publicly – months after it had occurred.

113.    When Dom Gerard was done speaking, Rusty, the 9th Grade Dean, facilitated another Worship Sharing for the entire class, as he did the prior week. During the Worship Sharing, another student in the class spoke out and expressed her concerns that the same group of AFS students had terrorized other AFS students in the past and continued to do so because there had been no consequences imposed by the school and these students had never been held accountable for their actions by AFS.

114.    On February 11, 2021, Dom Gerard emailed Father Doe and Mother Doe and said that they would continue to work with the 9th grade and the individual students involved to "come to greater closure for [Student Doe] and everyone involved," but nothing concrete was ever done by AFS thereafter.

115.    For the remainder of the 9th grade school year, despite repeated requests from Father Doe and Mother Doe as to what was being done to bring "greater closure for [Student Doe] and everyone involved," AFS never properly and fully investigated this matter, never followed up with addressing the major violations of community standards in accordance with its own Upper School Handbook, never held the individual students accountable for the ongoing harassment and bullying of Student Doe, and never brought the individual students together.

116.    Instead, on March 1, 2021, Dom Gerard declared that, from his perspective, AFS had been successful in addressing the issues and that, "as far as the students who were involved, I think they got the message loud and clear." As far as he was concerned, the situation had been resolved and, after months of improperly delaying any face-to-face meeting with the students involved, he advised that he had come to the conclusion that it was too late and that any further interpersonal work with the individual students and Student Doe would be counterproductive.

117.    As a result of AFS's actions and inactions, the harassment and bullying by AFS students toward Student Doe continued throughout the remainder of the 2020-21 school year. For instance, another AFS student, Student 4, sent Student Doe a message as late as May 5, 2021 calling Student Doe a "privileged white [expletive]."

118.    For the remainder of the school year, Student Doe remained shunned, became more and more isolated, and suffered severe physical, mental and emotional trauma.

119.    Student Doe was never reintegrated into the class, never received an apology or an acknowledgment from any of the students involved (with the exception of Student 3) of the pain they caused Student Doe, was never socially reacquainted with or accepted by Student Doe's peers at AFS, and did not feel emotionally able to return to campus for in-person learning for the remainder of the 2020-21 school year.

120.    Additionally, on May 6, 2021, the Head of School, Richard Nourie, sent an email to Father Doe and Mother Doe containing many factual inaccuracies and improperly defending Dom Gerard's and the AFS administration's actions in the handling of the matter, while also improperly accusing Student Doe of being racially insensitive and accusing Father Doe and Mother Doe of being antagonistic for simply advocating on behalf of their child and trying to bring about a resolution and the closure for Student Doe that had been promised by AFS.

121.    Ultimately, due to the repeated peer harassment and bullying experienced by Student Doe and the lack of support from AFS administrators and staff, Father Doe and Mother Doe ultimately were left with no choice but to withdraw Student Doe from AFS and to transfer Student Doe to another school in order to remove Student Doe from the hostile school environment Student Doe endured at AFS, but they had to wait until the end of the 2020-21 school due to AFS's block scheduling.

122.    As a direct result of the failure of AFS and its employees to comply with AFS's own Upper School Handbook, failure to take prompt and effective steps reasonably calculated to end the harassment, failure to eliminate any hostile environment and its effects, and failure to prevent the bullying and harassment from recurring, Student Doe suffered and continues to suffer from increased stress and anxiety which has manifested itself in significant physical and emotional injuries.

123.    Student Doe has suffered emotional trauma by the adult individuals who had a duty to educate Student Doe, to keep Student Doe safe, and to protect Student Doe.

124.    Student Doe treated with a private therapist for the psychological and emotional injuries resulting from the harassment from Student 1, Student 2, Student 3 and other AFS students, and the consistent and unchecked bullying and harassment that followed thereafter at AFS.

125.    The physical and mental effects of the harassment and bullying to which Student Doe was subjected at AFS have also necessitated ongoing treatment by a psychiatrist.

126.    Father Doe, Mother Doe and Student Doe suffered economic losses as a result of Student Doe's injuries, including but not limited to, (i) all tuition, costs, and fees paid to AFS during the 2019-20 and 2020-21 school years; (ii) all fees and costs paid to a tutor as a result of

AFS's conduct during the 2019-20 and 2020-21 school years; (iii) all fees and costs paid for therapy, counseling, and/or medical, psychological and psychiatric care required as a result of AFS's conduct; and (iv) all fees and costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct.

## V.    CAUSES OF ACTION

### Count I – Breach of Contract

127.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

128.    Plaintiffs had a contractual relationship with AFS, either express or implied.

129.    Upon information and belief, Plaintiffs and AFS were parties to enrollment agreements for the 2019-20 and 2020-21 school years at AFS, which are binding contracts. Such contracts were formed by AFS's offer of admission for both school years, Plaintiffs' acceptance of AFS' offers of admission, and Plaintiffs' payment (or payments made on their behalf) of tuition and fees to AFS for both school years.

130.    The parties' enrollment contracts, either express or implied, incorporated the terms of AFS's Handbooks and other AFS written policies, and Student Doe, Father Doe and Mother Doe became entitled to all the rights conferred by the promises in the enrollment contracts, the AFS Handbooks and other written policies.

131.    AFS breached its contract with Father Doe, Mother Doe and Student Doe by:

   a.    Failing to protect Student Doe from discrimination and harassment at school on the basis of disability;

   b.    Failing to protect Student Doe from discrimination and harassment at school on the basis of race;

c.  Failing to protect Student Doe from discrimination and harassment at school on the basis of national origin;

d.  Failing to protect Student Doe from discrimination and harassment at school on the basis of religion;

e.  Failing to follow the policies and procedures in the Upper School Handbook related to major violations of community standards, including convening the student-faculty Discipline Advisory Council (DAC) and providing consequences to the AFS students who bullied and harassed Student Doe;

f.  Failing to follow the policies and procedures in the Upper School Handbook in response to ongoing complaints and reports of bullying and harassment of Student Doe on the basis of Student Doe's race, national origin, and religion;

g.  Failing to follow the policies and procedures in the Upper School Handbook related to bullying and harassment, including failure to conduct a prompt investigation and to promptly take appropriate actions based on the circumstances;

h.  Failing to immediately acknowledge and publicly label the individual students' actions toward Student Doe, as described above, as bullying and harassment;

i.  Failing to impose prompt and effective remedial and safety measures reasonably calculated to end the ongoing bullying and harassment of Student Doe at AFS, to eliminate the hostile environment and its effects, and to prevent the harassment and bullying from recurring;

j.   Failing to report illegal or potentially illegal conduct to law-enforcement authorities; and

k.   Failing to convene an Upper School SST meeting and to provide Student Doe with a Formal Education Plan, and additional accommodations, supports, and supplemental strategies to address Student Doe's academic, social and emotional issues as they arose during Student Doe's 9th grade school year.

132.   These failures constitute material breaches of the express and implied terms of the parties' contract.

133.   Plaintiffs have been damaged as a result of this breach in an amount to be determined at trial.

134.   Those damages include, without limitation, (i) all tuition, costs, and fees paid to AFS during the 2019-20 and 2020-21 school years; (ii) all fees and costs paid to a tutor as a result of AFS's conduct during the 2019-20 and 2020-21 school years; (iii) all fees and costs paid for therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct; and (iv) all fees and costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct.

**Count II – Breach of Implied Covenant of Good Faith and Fair Dealing**

135.   Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

136.   Pennsylvania law recognizes an implied covenant of good faith and fair dealing in all contracts, either express or implied.

137.   By the conduct alleged herein, AFS breached the implied covenant of good faith and fair dealing and caused harm to Plaintiffs.

138.    Plaintiffs have been damaged as a result of this breach in an amount to be determined at trial.

139.    Those damages include, without limitation, (i) all tuition, costs, and fees paid to AFS during the 2019-20 and 2020-21 school years; (ii) all fees and costs paid to a tutor as a result of AFS's conduct during the 2019-20 and 2020-21 school years; (iii) all fees and costs paid for therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct; and (iv) all fees and costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of AFS's conduct.

**Count III – Intentional Infliction of Emotional Distress**

140.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

141.    As described more fully throughout this Complaint, AFS intentionally and outrageously subjected Student Doe to severe emotional distress manifesting in significant physical injuries by purposefully evading their legal obligation to take prompt and effective steps reasonably calculated to end the harassment and bullying, eliminate any hostile environment and its effects, and prevent the harassment and bullying from recurring.

142.    As described more fully throughout this Complaint, at all relevant times, AFS's conduct was so extreme, outrageous and shocking that it exceeded all reasonable bounds of decency as measured by what the average member of the community would tolerate.

143.    As described more fully throughout this Complaint, at all relevant times, AFS's conduct was motivated by callous indifference to Student Doe's rights.

144.    As a direct result of AFS's outrageous behavior, Student Doe suffered and continues to suffer from severe and lasting psychological trauma and injury, embarrassment,

humiliation and mental anguish and injury and other incidental and consequential damages and expenses, all to Student Doe's damage, in an amount that will be determined at trial.

### Count IV – Negligent Infliction of Emotional Distress

145.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

146.    A reasonable and prudent person in the same or similar circumstances as AFS would know or should have known that Student Doe's emotional distress was a foreseeable result of AFS's extreme and outrageous conduct.

147.    As described more fully throughout this Complaint, at all relevant times, AFS's conduct toward Student Doe was extreme and outrageous, going beyond all bounds of decency.

148.    As described more fully throughout this Complaint, at all relevant times, AFS's conduct was motivated by callous indifference to Student Doe's rights.

149.    As a direct result of AFS's outrageous behavior, Student Doe suffered and continues to suffer from severe and lasting psychological trauma and injury, embarrassment, humiliation and mental anguish and injury and other incidental and consequential damages and expenses, all to Student Doe's damage, in an amount to be determined at trial.

### Count V – Violation of Title VI of the Civil Rights Act

150.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

151.    On or around April 9, 2020, AFS applied for and received funding under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in the amount of $2,191,293.00.

152.    The federal government has been clear that recipients of these CARES Act funds are deemed to be recipients of federal financial assistance, which in turn requires that these institutions comply with and adhere to mandates under federal anti-discrimination statutes, including Title VI of the Civil Rights Act ("Title VI"), which prohibits discrimination based on race, color, or national origin.

153.    As a condition for receiving the PPP loan in 2020, AFS was required to and did acknowledge and confirm that it would comply with this civil rights law and any corresponding regulations.

154.    Additionally, AFS issued and/or published on AFS's website an SBA Non-Discrimination Compliance Policy, which clearly and unambiguously acknowledged its obligations to comply with the regulations issued by the SBA and other governmental agencies in enforcing civil rights laws.

155.    In the policy, AFS unequivocally acknowledged its obligations under Title VI to prohibit discrimination, harassment, or retaliation on the basis of race, color, and national origin in its educational programs, activities, and services.

156.    Yet, Student Doe was subjected to racial discrimination, bullying and harassment and a hostile environment at AFS on the basis of Student's Doe's race, color, and national original in violation of Title VI.

157.    AFS created a hostile environment against Student Doe in violation of Student Doe's civil rights under Title VI by failing to protect Student Doe from discrimination, bullying and harassment on the basis of Student Doe's race, color, and national origin.

158.    The severe, pervasive and ongoing race-based and anti-Semitic discrimination, bullying and harassment that AFS allowed to persist created a hostile environment for Student

Doe, interfered with Student Doe's ability to participate in or benefit from the services and activities offered by AFS.

159.   Plaintiffs placed AFS on notice that Student Doe was being subjected to discrimination, bullying and harassment at AFS on the basis of Student Doe's race, color and national origin by making several complaints to AFS's administrators and staff as described above.

160.   AFS knew or should have known about the discrimination, bullying and harassment at AFS that Student Doe was subjected to and failed to take appropriate remedial action.

161.   AFS completely failed in its responsibility to discipline the AFS students who made the racially hostile and anti-Semitic remarks (which should have been an important first step of AFS's response) in violation of the policies and procedures in the Upper School Handbook, and failed to acknowledge the pattern of bullying and harassment Student Doe suffered as indicative of a racially-hostile and anti-Semitic school environment in violation of Title VI.

162.   AFS failed to appropriately and aggressively respond to the harassment and bullying of Student Doe when they first became aware of it and to discipline the individuals involved, as well as to promptly implement an effective systemic response to address the unique effect that the misconduct had on the school climate.

163.   AFS tolerated the discrimination, bullying and harassment at AFS, did not immediately, appropriately and/or effectively address it, downplayed it, and, at times, defended it.

164.    AFS's failure to maintain an educational environment free of discrimination, bullying and harassment on the basis of race, color and national origin, and failure to take prompt remedial action to address the hostile environment to which Student Doe was subjected, were intentional, malicious, and in reckless indifference to Student Doe's protected federal rights.

165.    The hostile environment to which Student Doe was subjected to would have detrimentally affected a reasonable person in Student Doe's position.

166.    At all times relevant and material to this Complaint, Student Doe was a member of a protected class.

167.    At all times relevant and material to this Complaint, AFS treated Student Doe differently from Student Doe's similarly situated classmates who were not of Student Doe's race, color and national origin.

168.    As a result of AFS's actions, Student Doe has had Student Doe's reputation damaged and standing in the community lowered, has suffered and continues to suffer from severe and lasting psychological trauma and injury, embarrassment, humiliation and mental anguish and injury and other incidental and consequential damages and expenses, all to Student Doe's damage, in an amount to be determined at trial.

**Count VI – Discrimination in Violation of Section 504 of Rehabilitation Act**

169.    Plaintiffs incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

170.    The District has intentionally, purposefully and with deliberate indifference violated the rights of Student Doe under Section 504 of the Rehabilitation Act ("Section 504").

171.    Section 504, 29 U.S.C. § 794 *et seq.*, and its implementing regulations, 34 C.F.R. Part 104 *et seq*. require that qualified individuals with disabilities not be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination by a recipient of federal financial assistance. Failure to provide accommodations and supplemental services constitutes discrimination for purposes of Section 504.

172.    Student Doe is an individual with a disability under Section 504 – i.e., a Specific Learning Disability and Anxiety.

173.    Student Doe was otherwise qualified to participate in all school programs and activities.

174.    During all relevant times, AFS offered programs and activities that received federal financial assistance.

175.    Specifically, on or around April 9, 2020, AFS applied for and received funding under the Paycheck Protection Program ("PPP") of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in the range of $2 million – $5 million.

176.    The federal government has been clear that recipients of these CARES Act funds are deemed to be recipients of federal financial assistance, which in turn requires that these institutions comply with and adhere to mandates under federal anti-discrimination statutes, including Section 504 of the Rehabilitation Act ("Section 504"), which prohibits discrimination against qualified individuals with a disability, without any religious exemption.

177.    Indeed, as a condition for receiving the PPP loan, AFS was required to acknowledge and confirm that it would comply with this civil rights laws and any corresponding regulations.

178.    Additionally, AFS issued and/or published an SBA Non-Discrimination Compliance Policy, clearly and unambiguously acknowledging its obligations to comply with the

regulations issued by the SBA and other governmental agencies, which would also include the regulations issued by the U.S. Department of Education, in enforcing the civil rights laws.

179.    In AFS's SBA Non-Discrimination Compliance Policy, AFS acknowledged its obligation under Section 504 of the Rehabilitation Act, as a recipient of federal financial assistance, to ensure that no otherwise qualified individual with a disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance, including both academic and non-academic services, and to make reasonable accommodations to disabled individuals to permit such persons to participate in and enjoy the benefits of AFS's programs and activities.

180.    Although AFS had knowledge that Student Doe was a student with a Specific Learning Disability and was diagnosed with Anxiety, entitling Student Doe to protection under Section 504, AFS excluded Student Doe from participation in, denied Student Doe the benefits of its services, programs and activities, and otherwise discriminated against Student Doe based on Student Doe's disability by not evaluating Student Doe, by not convening a Section 504 Meeting, by not issuing a Section 504 Plan in order to accommodate Student Doe's disabilities at any time during the 2020-21 school year, and by not providing Student Doe with accommodations and supplemental services in violation of its obligations under Section 504 and its implementing regulations.

181.    AFS acted intentionally or with deliberate indifference towards Student Doe's federal rights.

182.    AFS knew that a federally protected right was substantially likely to be violated and failed to act despite that knowledge.

183.    AFS's failures continued throughout the 2020-21 school year, despite AFS's knowledge of the ongoing harm being suffered by Student Doe, including the increase in Student Doe's anxiety and anxiety-related symptoms as a result of AFS's conduct.

184.    Student Doe suffered and continues to suffer damages including but not limited to humiliation, mental anguish, pain and suffering, and loss of educational benefit.

### PRAYER FOR RELIEF AND JURY DEMAND

Plaintiffs pray this Honorable Court for the following relief in satisfaction of their claims:

(a)  That the Court enter judgment against Defendant AFS;

(b)  That the Court order AFS to pay compensatory and consequential damages to Plaintiffs in an amount to be determined at trial;

(c)  That the Court order AFS to pay common-law punitive damages in an amount to be determined at trial;

(d)  That the Court award pre-judgment and post-judgment interest as permitted by law;

(e)  That the Court award attorneys' fees and costs which Plaintiffs have incurred or will incur in prosecuting this action as permitted by law, including expert costs; and

(f)  That the Court award such other, additional and separate relief as the case may require and/or that the Court may deem just and proper under the circumstances.

**PLAINTIFFS, PURSUANT TO RULE 38 OF THE FEDERAL RULES OF CIVIL PROCEDURE, REQUEST A TRIAL BY JURY ON ALL COUNTS RAISED IN THIS COMPLAINT.**

Dated: <u>January 3, 2022</u>                    Respectfully submitted,


                                  /s/ *Scott H. Wolpert*
                                  _____
                                  Scott H. Wolpert, Esquire (PA Bar No. 62894)
                                  Christine M. Gordon, Esquire (PA Bar No. 209391)
                                  **TIMONEY KNOX, LLP**
                                  400 Maryland Drive
                                  Fort Washington, PA 19034-7544
                                  Tel: (215) 540-2656
                                  swolpert@timoneyknox.com
                                  cgordon@timoneyknox.com

                                  *Attorneys for Plaintiffs*

## VERIFICATION

STUDENT DOE, being duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within matter and that the facts set forth in the foregoing Complaint are true and correct to the best of her knowledge, information and belief; and that this statement is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date:_____1/3/22_____                    _*Student Doe*_____
                                               STUDENT DOE

1811353-1

## VERIFICATION

FATHER DOE, being duly sworn according to law, deposes and says that he is one of the Plaintiffs in the within matter and that the facts set forth in the foregoing Complaint are true and correct to the best of his knowledge, information and belief; and that this statement is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date:   _____1/3/22_____                        _Father Doe_
                                                FATHER DOE

## **VERIFICATION**

MOTHER DOE, being duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within matter and that the facts set forth in the foregoing Complaint are true and correct to the best of her knowledge, information and belief; and that this statement is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: _____1/3/22_____

*mother Doe*
MOTHER DOE

1811353-1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____

Address of Defendant: _____ 575 Washington Lane, Jenkintown, PA 19046 _____

Place of Accident, Incident or Transaction: _____ Abington Friends School, Jenkintown, PA _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ N/A _____ Judge: _____ N/A _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? — Yes ☐ No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? — Yes ☐ No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court? — Yes ☐ No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? — Yes ☐ No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: *January 4, 2022*     _____ *Must sign here*     62894
_____      _____      _____
                               *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.      *Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.      *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Scott H. Wolpert, Esquire _____, counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: *January 4, 2022*     _____ *Sign here if applicable*     62894
_____      _____      _____
                               *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*