IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STUDENT DOE, et al., *Plaintiffs,* v. ABINGTON FRIENDS SCHOOL, *Defendant.* | CIVIL ACTION NO. 22-0014 |

**PAPPERT, J.**                                                                November 4, 2022

### MEMORANDUM

Plaintiffs, Student Doe and the child's mother and father, sued Abington Friends School for breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress and violations of Title VI of the Civil Rights Act and § 504 of the Rehabilitation Act. AFS moved to dismiss the Amended Complaint. After reviewing the Motion (ECF 8), Doe's Response (ECF 10) and the school's Reply (ECF 11) and holding oral argument (ECF 13), the Court grants AFS's motion as to the intentional infliction of emotional distress, negligent infliction of emotional distress and Title VI claims. It denies the motion with respect to the breach of contract and Rehabilitation Act claims. Plaintiffs will be allowed to amend their complaint with respect to the Title VI claim and one discrete aspect of the breach of contract claim.

I

Plaintiff Doe is a white, Jewish child with a disability. (Am. Compl. ¶ 2, ECF 6.) Specifically, Doe suffers from anxiety and a specific learning disability in math. Until eighth grade, Doe attended public school and received special education services. (*Id.* ¶¶ 16, 19.) For eighth grade—the 2019–2020 academic year—Doe's parents enrolled

1

Doe at AFS, a private Quaker school. (*Id.* ¶ 17.) Before the school year began, Doe's parents provided AFS with documentation of Doe's diagnoses and a copy of the most recent Individualized Education Program (IEP) from Doe's public school. (*Id.* ¶ 21.) AFS staff met with Doe's parents and developed a Formal Education Plan to address Doe's disabilities. (*Id.* ¶ 22.) The plan provided for several supports to address Doe's math-related disability. It did not make any adjustments to its academic program for Doe's anxiety, but noted that Doe was working with a therapist outside of school to address that disability. (*Id.*)

Doe began eighth grade in September of 2019 and "immediately struggled in keeping up with the classes and had significant social and school anxiety issues." (*Id.* ¶23.) AFS worked with Doe's parents to add supports, including a "no-grading" policy in most of Doe's classes and bi-weekly meetings between Doe's parents and advisor. (*Id.* ¶ 27.)

During the first semester, the entire eighth-grade class was invited to Doe's bar/bat mitzvah. (*Id.* ¶ 31.) Doe alleges that during the event, the DJ played a clean version of a song that, in its original version, included the "N-word" in its lyrics. "[U]nbeknownst to Student Doe and Student Doe's family at the time . . . . at least one of the young white guests at the party (not Student Doe) reportedly sang the real lyrics aloud using the 'N-word.'" (*Id.* ¶ 32.) Following this event, a group of Doe's Black AFS classmates (Student 1, Student 2, and Student 3) allegedly began a "character assassination campaign" against Doe, which continued through the end of the school year. They "repeatedly referred to Student Doe as a 'racist'" and made anti-Semitic remarks toward Doe in school, over text messaging and on social media. (*Id.* ¶¶ 35–37.)

Doe alleges that at least one teacher, Sunshine O'Donnell, "was made aware of the alleged incident at the bar/bat mitzvah and of what was occurring during the 2019–20 school year with respect to Student Doe, but she did nothing to proactively protect Student Doe." (*Id.* ¶ 38.) Doe also alleges that academic advisor Justin Solonyka acknowledged the dynamic between Doe and the other students in a May 28, 2020 email to Doe's father. (*Id.* ¶ 43.) Although Doe's parents met with AFS personnel to discuss the alleged bullying and harassment, Doe states that AFS did not investigate or address the problems at that time. (*Id.* ¶ 47.)

Doe's academic and social challenges continued in ninth grade. Doe's parents hired a private tutor to help Doe outside of school. (*Id.* ¶ 52.) They also reached out to the Director of the Wilf Learning Center at AFS, Megan Asplundh, to request additional support. (*Id.* ¶ 58.) Ms. Asplundh declined to meet with Doe's parents, stating that her schedule was full, but directed them to online resources and suggested that they follow up with Doe's private tutor. (*Id.* ¶ 59.)

Other students continued to accuse Doe of being a racist, in school and through texting and social media. The alleged bullying escalated on December 6, 2020, when students accused Doe of "blackfishing" because Doe had worn bronzer that made Doe's complexion appear darker. (*Id.* ¶ 64.) Doe's parents immediately reported the incident to Dom Gerard, Head of the Upper School at AFS. The following day Doe's parents gave copies of the allegedly harassing texts and online messages to Gerard, and at a meeting on December 8th, AFS staff "promised that they would conduct an investigation and report back." (*Id.* ¶¶ 65–66.) On December 10, 2020, a classmate posted side-by-side photos of Doe with and without bronzer, with a caption calling Doe

3

a "racist," on Instagram. (*Id.* ¶ 67.) Five days later, Student 1 circulated a photo of one of Doe's Black friends with an offensive caption and falsely told others that Doe had created it. (*Id.* ¶ 70.) Doe's parents immediately reported each incident to AFS. (*Id.* ¶¶ 68, 72.)

Virtual meetings were held on December 16th and 17th with Doe's parents, Dom Gerard, and Matthew Eskin, Head of AFS Middle School. Gerard and Eskin suggested bringing the students together for a face-to-face meeting, but this never occurred. (*Id.* ¶¶ 75, 79.) Doe's parents elected for Doe to attend school virtually until the situation resolved. (*Id.* ¶ 80.) Although Dom Gerard spoke to the student body after winter break about social media and how to treat each other, he did not specifically address the incidents relating to Doe. (*Id.* ¶ 84.) Doe's parents did not receive any updates on the investigation. On January 25, 2021 Gerard met with Doe's parents and informed them that he had spoken to Student 1's parents, who did not believe their child had done anything wrong. (*Id.* ¶ 111.) Gerard declined to arrange a face-to-face meeting between Doe and Student 1. (*Id.* ¶ 114.) On January 29th, Gerard and Doe's parents agreed on a plan to re-integrate Doe into the class and incorporate training about anti-Semitism into the curriculum. (*Id.* ¶ 120.) The plan did not, however, address an investigation of or disciplinary procedures relating to Doe's bullying and harassment complaints. (*Id.* ¶ 121.) On February 3, 2021, Gerard spoke to the ninth-grade class for the first time about what had occurred with Doe, but AFS did not take any other steps to investigate the matter or take disciplinary action. (*Id.* ¶¶ 122, 126.)

As a result of the alleged bullying, harassment and isolation, Doe experienced increased anxiety that manifested in emotional and physical symptoms. (*Id.* ¶ 133.) At

the end of the 2020–2021 school year, Doe's parents removed Doe from AFS. (*Id.* ¶ 132.)

## II

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the factual allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis. *Fowler v. UPMC Shadyside*, 578 F. 203, 210 (3d Cir. 2009). First, the Court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Then, it "must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court must "construe the complaint in the light most favorable to the plaintiff . . . ." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

## III

Doe first asserts a claim for breach of contract, premised on AFS's purported obligations in the enrollment agreement and student handbook. To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buclker, Bebenek, & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). In Pennsylvania, "the relationship between a private educational institution and an enrolled student is contractual in nature . . . ." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).

Doe argues that the student handbook, (Ex. B, ECF 6-2) which was incorporated by reference into the enrollment agreement (Ex. A, ECF 6-1) signed by Doe's parents and AFS, is part of the contract between the parties; a private school's student handbook is part of the contract with the student. *See Swartley*, 734 A.2d at 919. To succeed on a breach of contract claim, the student must be able to "point to specific undertakings in the handbook that were not provided." *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 655 (E.D. Pa. 2012) (citing *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992). Mere "aspirational" language is not sufficiently definite to create an enforceable obligation. *See Figueroa v. Point Park Univ.*, 553 F. Supp. 3d. 259, 272 n.23 (W.D. Pa. 2021) (collecting cases distinguishing puffery from enforceable promises); *see also David v. Neumann Univ.*, 187 F. Supp. 3d 554, 560 (E.D. Pa. 2016) ("Instead of contractually guaranteeing a right to specific types of investigation, support, or sanctions in the event that a student experiences offensive and unwelcome conduct, the provisions [of the school's anti-harassment policy] merely declare the University's aspirational approach" to harassment complaints.) Doe alleges that several handbook provisions impose on AFS procedural obligations relating to learning support and discipline, and that AFS breached those obligations.

A

Doe alleges that AFS promised in the handbook that a student support team would convene and develop a formal education plan to address Doe's learning disabilities. In a section titled "Student Support Services," the handbook says that "the Student Support Team (SST) in Upper School meets weekly to address academic, behavioral, social or emotional issues of students as they arise . . . ." (Ex. B, at 13.)

6

Later in the section, the handbook says that "[u]pon receiving a [psycho-educational or neuropsychological] evaluation, a meeting of the SST and the family is held to review results and recommendations. . . . A Formal Education Plan (FEP) is developed and then shared and implemented with teachers and families." (Ex. B, at 14.) Appendix A to the handbook includes additional accommodation policies pursuant to the obligations AFS purportedly assumed by accepting an SBA Paycheck Protection Program (PPP) loan. (*Id.*, at 29.) Under the heading "Interactive Process and Accommodation Plan," it says:

> Once a request for accommodation is received, the School will enter into the interactive process with the parent (and possibly student) to discuss the need and information that the School will need . . . . Once the documentation is provided, the appropriate personnel at the School will assess the accommodation requests and determine what accommodations can/should be provided at school, at home, and through third-party providers. After discussing these issues with the parent and coming to an agreement on the terms, the School will set forth the agreement in an Accommodation Plan, which will be signed by the School and the parent and will be distributed to those persons needing to implement the accommodations.

(*Id.*, at 34.) The handbook instructs parents to contact the Section 504 Compliance Officer to make an accommodation request. (*Id.*)

The handbook provisions describe specific actions to be carried out at specified times, and the mandatory language indicates that AFS cannot choose a different response to a triggering event. They are therefore sufficiently definite to create an enforceable promise to (1) convene the SST each week, (2) when AFS receives a psycho-educational or neuropsychological evaluation, convene a meeting of the SST and family and develop a Formal Education Plan and (3) when a parent requests an

accommodation, engage in an interactive process and draft an Accommodation Plan to be signed by the parent and AFS.

Doe alleges that AFS "[f]ail[ed] to convene an Upper School SST meeting." (Am. Compl. ¶ 131(k).) The Complaint also states a claim for breach of the obligation to engage in the interactive process and develop an Accommodation Plan during the Doe's ninth grade year. Doe alleges that AFS "kn[ew] of the ongoing harm being suffered by Student Doe, including the increase in Student Doe's anxiety" but failed to convene a meeting or issue a written accommodation plan. (Compl. ¶¶ 56–57.)

The Complaint does not plausibly allege that AFS breached its promise to hold an SST meeting to develop an FEP during Doe's ninth grade year. That obligation arises when AFS receives a psycho-educational or neuropsychological evaluation. (Ex. B, at 14.) Doe acknowledges that AFS held the required SST meeting and drafted an FEP in August of 2019 after Doe's parents sent AFS a copy of the 2016 psychological evaluation report. (Am. Compl. ¶ 21.) Doe argues that AFS was obliged to re-convene the SST and revise the FEP the following year because the four-year-old evaluation was no longer relevant in light of Doe's increasing anxiety. (*Id.* ¶¶ 55–56.) But Plaintiffs do not allege that Doe's parents sent AFS a new or revised evaluation that would trigger the obligation to revise the FEP. Plaintiffs will be given leave to amend this aspect of the breach of contract claim.

B

Doe also points to several handbook provisions relating to procedures for investigating and addressing claims of bullying and harassment that are sufficiently definite to be enforced. The section of the handbook titled "Bullying, Harassment,

Sexual Harassment" defines "bullying" and "harassment" and directs students who believe they have been bullied or harassed to "[s]peak promptly with an adult at school (an advisor, teacher, school counselor, nurse, or administrator) to report the concern."[1] (Ex. B, at 25.) "After a student has reported a concern, the adult will refer the complaint to the Division Director or the Head of School. . . . The school administration will initiate a prompt investigation and take appropriate action based on the circumstances." (*Id.* at 26.) Although the handbook indicates that the school has discretion in determining whether the conduct complained of constitutes bullying or harassment, the reporting and investigation procedures are couched in mandatory language—"the adult *will refer* the complaint" and "the school administration *will initiate a prompt investigation*." (*Id.*) (emphasis added).

The handbook section on "Community Standards" lists bullying and harassment as "major violations of community standards." (Ex. B, at 17). It goes on to state that "[w]hen a student has violated a major community standard, the Dean of Students will convene the student-faculty Discipline Advisory Council (DAC) to recommend

---

[1]  Bullying is an act or series of acts directed at another student or group of students that interfere with a student's education, create a threatening environment, or substantially disrupt the operation of the school. The action toward another student must be severe, persistent, or pervasive. It must be intentional and can be in written, verbal, physical, relational, or electronic form. Bullying can occur in many types of school-related environments such as the classroom, on transportation, during any school-sponsored activity such as field trips or after-school events, and online. . . .

Examples of bullying include, but are not limited to: writing or saying insulting comments or threats[;] spreading rumors or gossiping[;] hitting, shoving or blocking normal movement[;] psychological manipulation or provocation

When bullying stigmatizes, intimidates, or victimizes someone based on their race, sex, religion ethnicity, sexual orientation, gender identity, socio-economic status, age, physical or other personal characteristics, then it is considered **harassment**.

(Ex. B, at 22–23 (emphasis in original).)

9

appropriate consequences to the Upper School Director or Head of School." (*Id.*) Doe argues that, taken together, these provisions obligate AFS, upon receiving a complaint of bullying or harassment, to conduct a prompt investigation into the complaint. AFS has discretion in determining whether conduct qualifies as bullying or harassment, but if it finds that it qualifies, it must convene a DAC meeting.

The facts alleged in the Complaint are sufficient to state a claim for breach of AFS's contractual promise to promptly investigate bullying and harassment complaints. The other students' alleged conduct toward Doe during the 2019–2020 school year could plausibly qualify as "bullying" or "harassment" under AFS's policies. Doe alleges that Sunshine O'Donnell, one of Doe's middle school teachers, was aware of the problem during the 2019–2020 school year. (Am. Compl. ¶ 38.) Doe also alleges that Doe's academic advisor, Justin Solonyka, confirmed that he was aware of the "dynamics" between Doe and the other students in a May 28, 2020 email. (*Id.* ¶ 42.) Under the terms of the handbook, these adults had to report the complaints to the Division Director or Head of School, and AFS was required to promptly investigate them, something Doe alleges was not done. (*Id.* ¶ 47.)

Doe also plausibly alleges that AFS failed to conduct a prompt investigation into the continued bullying the next year. Specifically, Doe's parents contacted Dom Gerard, Head of the Upper School, on December 6, 2020 to report that classmates were again targeting Doe, accusing Doe of "blackfishing" because Doe had worn bronzer. (*Id.* ¶ 64.) This continued over the next ten days, and Doe's parents kept AFS personnel apprised of those developments. (*Id.* ¶¶ 67–75.) Doe alleges that as of January 25, 2021 AFS had not conducted a proper investigation into the complaints. (*Id.* ¶¶ 111–

15.) Accepting these facts as true and drawing all reasonable inferences in Doe's favor, the Complaint states a claim for breach of the duty to promptly investigate complaints of bullying and harassment.

IV

A

Doe brings a claim for intentional infliction of emotional distress based on AFS's alleged failure to intervene in the harassment. (Compl. ¶¶ 140–44.) For an IIED claim to be plausible under Pennsylvania law, "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Jordan v. Pa. State Univ.*, 276 A.3d 751 (Pa. Super. Ct. 2022) (quoting *Madreperla v. Williard Co.*, 606 F.Supp. 874, 879–80 (E.D. Pa. 1985)). Under the first prong, the "conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation and internal quotations omitted). "Conduct that Pennsylvania courts have deemed sufficiently outrageous to constitute IIED includes: (1) killing the plaintiff's son with an automobile and then burying the body, rather than reporting the incident to the police; (2) intentionally fabricating documents that led to the plaintiff's arrest for murder; and (3) knowingly releasing to the press false medical records diagnosing the plaintiff with a fatal disease." *Dull v. W. Manchester Twp. Police Dep't*, 604 F. Supp. 2d 739, 756 (M.D. Pa. 2009) (citing *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (collecting cases)).

The conduct underlying the IIED claim is the school's alleged failure to follow its policies for investigating and resolving bullying complaints, something that is neither extreme nor outrageous enough to meet the requisite standards under Pennsylvania law, and it would be futile for Plaintiffs to amend.[2]

B

Nor can Doe's claim for negligent infliction of emotional distress survive dismissal or be amended to proceed any further. Pennsylvania has limited NIED claims to four factual scenarios: (1) "the plaintiff suffered a physical impact"; (2) "the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury"; (3) "the plaintiff observed a tortious injury to a close relative"; or (4) "the defendant had a contractual or fiduciary duty towards the plaintiff." *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 592 (W.D. Pa. 2019). The status of the fourth factual scenario—the only one under which Doe could plausibly proceed—is unsettled in Pennsylvania. And even if the Pennsylvania Supreme Court were to recognize such a category, it would not apply to this case. In *Toney v. Chester Cnty Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008), the Superior Court of Pennsylvania held that a mother who gave birth to a child with severe physical deformities could bring an NIED claim against the hospital and staff who performed a pelvic ultrasound and reported no physical abnormalities, based on a theory of breach of contractual or fiduciary duty. On appeal, the Supreme Court of Pennsylvania was evenly divided as to

---

[2] Even if Plaintiffs' alleged facts could plausibly state claims for IIED and NIED, those claims would likely be barred by Pennsylvania's "gist of the action" doctrine, which "prevents plaintiffs from recasting ordinary breach of contract claims as tort claims." *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 591–92 (W.D. Pa. 2019). At oral argument, Plaintiffs' counsel acknowledged that the doctrine "is a problem for both of these claims." (Hrg. Tr. 57:8–9, ECF 14.)

12

whether such a relationship could support an NIED claim. *Toney v. Chester Cnty. Hosp.*, 36 A.2d 83, 100 (Pa. 2011). Its opinion is therefore persuasive only, as it was "in support of affirmance, and not the Opinion of the Court." *MDB*, 386 F. Supp. 3d at 593. Since *Toney*, Pennsylvania's lower courts have limited the kinds of contractual and fiduciary relationships that could give rise to an NIED claim to a narrow set of circumstances involving doctor-patient relationships and adoptions. *See Kovalev v. Walmart, Inc.*, No. 22-1217, 2022 WL 16536230 at *5 (E.D. Pa. Oct. 28, 2022). The contractual relationship between a private school and its student cannot support an NIED claim under Pennsylvania law. *MDB*, 386 F. Supp. At 594; *see also Humphries v. Pa. State Univ.*, No. 20-0064, 2021 WL 4355352 at *22 (M.D. Pa. Sept. 24, 2021).

V

Doe also alleges that AFS violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by failing to protect Doe from harassment. To plead a Title VI claim for student-on-student harassment, a plaintiff must show (1) severe or pervasive harassment based on the student's race, color or national origin and (2) deliberate indifference by the school to known acts of harassment. *L.L. v. Evesham Twp. Bd. of Educ.*, 710 Fed. App'x 545, 549 (3d Cir. 2017) (quoting *Castleberry v. STI Gp.*, 863 F.3d 259, 264 (3d Cir. 2017); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). For the most part, other students targeted Doe based on accusations that Doe was a racist; not because of Doe's race. Courts in this District have recognized on several occasions that persons accused of being racist are not the subjects of discrimination "based on race" under federal anti-discrimination law. *See, e.g., Bank v. Cmty. Coll. of Phila.*, No. 22-293 2022 WL 2905243, at *5 (E.D. Pa. July 22, 2022) (collecting cases).

The Complaint only alleges one incident when Doe's race was mentioned—when Student 6, who was not one of the three alleged ringleaders, called Doe a "privileged white [expletive]." (Am. Compl. ¶ 128.) This comment alone is not sufficiently severe to give rise to a claim under Title VI. Plaintiffs will be allowed to amend this claim to the extent they can allege facts which could plausibly show Doe was severely or pervasively harassed based on her race and that AFS was deliberately indifferent to known acts of racial harassment, or other conduct by AFS that would violate Title VI's prohibition on discrimination on the ground of race, color or national origin.

## VI

Finally, Doe alleges that AFS violated § 504 of the Rehabilitation Act by failing to (1) evaluate Doe, (2) convene a "Section 504 meeting" and develop an accommodation plan and (3) provide accommodations during the 2020–2021 school year. To state a claim for violation of § 504, a plaintiff must show that they are (1) "disabled as defined by the Act," (2) "'otherwise qualified' to participate in school activities," (3) "the school or the Board receives federal financial assistance" and (4) the student was "excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *J. v. Sch. Dist. of Phila.*, No. 06-3866, 2007 WL 1221216 at *4 (E.D. Pa. April 25, 2007). In addition, where the plaintiff seeks compensatory damages, they must demonstrate that the discrimination was intentional. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013). Pleading deliberate indifference—the school knew a federally protected right was substantially likely to be harmed and failed to act—will suffice to show intentional discrimination. *Id.* at 263.

At this stage of the proceedings, Doe has set out a plausible § 504 claim. Anxiety and specific learning disability in math may constitute disabilities that substantially limit the major life activity of learning under the Rehabilitation Act. *See* 34 C.F.R. § 104.3(j)(2). Doe, as an eighth-grade graduate of the appropriate age, was otherwise qualified to attend ninth grade at AFS. *See* 34 C.F.R. 104.3(*l*)(4); Lynn M. Dagett, *"Minor Adjustments" and Other Not-So-Minor Obligations: Section 504, Private Religious K–12 Schools, and Students with Disabilities*, 52 U. Louisville L. Rev. 301, 310 (2014) (essential eligibility requirements include age and entering academic credentials).

Doe alleges that AFS, by virtue of an SBA Paycheck Protection Program (PPP) loan, was a recipient of federal funding for purposes of the Rehabilitation Act. (Am. Compl. ¶195). Many courts that have considered the issue—though not all—have found allegations that a program received a PPP loan sufficient to establish receipt of federal financial assistance for the purpose of surviving a motion to dismiss. *See, e.g.*, *E.H. by and through Herrera v. Valley Christian Acad.*, No. 21-07574, 2022 WL 2953681 at *6 & n.6 (C.D. Cal. July 25, 2022) (collecting cases). *But see, e.g.*, *Lucius v. Fort Taco, LLC*, No. 21-22397, 2022 WL 335491 at *6 (S.D. Fla. Jan. 5, 2022). At this early stage of the litigation, Doe's Complaint plausibly alleges that AFS is covered by the Rehabilitation Act.

A private school's obligations to students with disabilities under § 504 are less onerous than those imposed on public schools. S*ee* Daggett, *supra*, at 320–21. In addition to certain procedural and reporting requirements, private schools have an affirmative obligation to make "minor adjustments" that would enable students with

15

disabilities to participate in school programs. 34 C.F.R. § 104.39(a). Doe alleges that AFS did not provide any accommodations during Doe's ninth-grade year. (Am. Compl. ¶199; Pls.' Resp. to Def.'s Mot. to Dismiss Pls.' Am. Compl. 22 n.3, ECF 10.) This is sufficient, for now, to state a claim that Doe was excluded from benefits or participation because of a disability.

Finally, Doe alleges sufficient facts to show AFS acted with deliberate indifference. AFS was aware of Doe's disability by the 2020–2021 school year. Doe's parents provided records of Doe's diagnosis and public school IEP before eighth grade began, AFS provided extensive accommodations for Doe's disabilities during eighth grade, and Doe's parents communicated with Doe's academic advisor throughout ninth grade about the continuing need for academic support. The handbook's representation that the PPP loan obligated AFS to comply with federal antidiscrimination laws does not by itself establish a legal obligation to do so. But it does establish AFS's knowledge of a federal right that would likely be violated if it failed to provide accommodations.

An appropriate Order follows.

                                              BY THE COURT:

                                               */s/ Gerald J. Pappert*

                                              GERALD J. PAPPERT, J.